MARY WORONKA & another *vs.* WESTON SEWALL.

Suffolk.    October 8, 1946. — November 4, 1946.

Present: FIELD, C.J., DOLAN, RONAN, WILKINS, & SPALDING, JJ.

*Negligence,* Physician and surgeon.  *Evidence,* Admissions and confessions.

Evidence in an action by a woman against an obstetrician, including admissions and answers to interrogatories by the defendant, warranted a finding that while the plaintiff was in childbirth in a hospital delivery room and in charge of the defendant, who delivered the baby, she suffered burns due to negligence of the defendant in allowing her skin to be exposed for too long a time to a sterilizing solution applied by him.

Admissions of negligence by an obstetrician could properly be found upon his statements to the effect that burns suffered by a patient whom he delivered of a baby at a hospital, where she was under his direction and care, were due to her skin being exposed too long during the delivery to a sterilizing solution administered by him; that the occurrence should not have happened and he could not understand how it happened; and that the occurrence was "because of negligence" during the delivery.

CONTRACT OR TORT. Writ in the Superior Court dated September 15, 1942.

The action was tried before *Hammond, J.,* who ordered verdicts for the defendant. The plaintiffs alleged exceptions.

*S. Cohen,* (*M. W. Titlebaum* with him,) for the plaintiffs.

*J. F. Dunn, Jr.,* (*C. J. Dunn* & *J. W. Cussen* with him,) for the defendant.

WILKINS, J. This is an action of contract or tort against a physician specializing in obstetrics. The declaration is in three counts. Counts 1 and 2 are respectively in contract and tort, and allege an undertaking by the defendant to care for the plaintiff Mary Woronka (hereinafter called the plaintiff) "before, during, and for some time after the birth of her child" and negligent treatment causing burns on the buttocks which resulted in keloids. Count 3 is by the plaintiff's husband for consequential damages. G. L. (Ter. Ed.) c. 231, § 6A, as inserted by St. 1939, c. 372, § 1. The judge directed verdicts for the defendant.

The jury could have found the facts hereinafter set forth. On May 7, 1940, the plaintiff, then pregnant, and her husband consulted the defendant, an obstetrician, who undertook to treat the plaintiff before, during, and for as long after childbirth as she should need care, "no matter what resulted." He saw her sixteen times in the pre-natal period. About 11 P.M. on December 20 the plaintiff, who was in mild labor and three weeks overdue, entered a lying-in hospital in Boston, where the defendant had arranged for her room. The baby, which was her first and a large one, was born about 2:10 A.M. on December 22. The plaintiff had a difficult labor of thirty-five hours, and delivery was by the use of forceps after the defendant had performed an operation known as an episiotomy. She was in the delivery room on a hospital bed "for a good many hours," and was moved onto the delivery table when ready for delivery and then given ether anesthesia. About twelve minutes after anesthesia had started, in order to sterilize the field of operation, the defendant applied Scott's solution to the legs, to the perineum, and to an area extending half way from the pubic bone to the umbilicus. The ingredients of Scott's

solution are mercurochrome, distilled water, ninety-five per cent alcohol, and a chemical known as acetone (a solvent, which has a tendency to dry up). During the delivery, which consumed "perhaps an hour and ten minutes," the plaintiff, draped with sterile sheets and towels, lay on her back with her legs held by nurses, her buttocks resting on the "bed" where the defendant was operating. "She was lying on a rubber sheet at the time of delivery; the rubber sheet was put just under her buttocks. She was lying on a hospital sheet, the rest of her body on a sterile towel between the rubber sheet and her buttocks." During the course of delivery he had another doctor as an assistant. The defendant "was theoretically in charge of the delivery room at the time of the delivery." The nurses were under his directions and orders. Compare *Guell* v. *Tenney,* 262 Mass. 54, 55–56.

In the afternoon of December 22 the plaintiff, who was in her room which was downstairs from the delivery room, told the defendant that her back was sore and burned, and the defendant said that it was natural and it would leave in a few days. There was a similar conversation the following day. On December 24 she told the defendant her back was worse and burning. The defendant made an examination, which disclosed on each buttock a second degree burn covering in each case an area of approximately two by three inches. He then said, "My God, what a mess; my God, what happened here . . .. It is a darn shame to have this happen." He also said that "she had a very hard delivery, and it was a burning shame to get that on top of it, and it was because of negligence when they were upstairs." On Christmas day the defendant talked with the plaintiff's husband in her room and at that time said that it was unfortunate; that a thing like that should not have happened and the staff was going to take steps to correct it; that apparently it was from the solution being allowed to stay in the part of the "mat" which was recessed from the pressure; and that "the closest he could figure was that the solution was on the rubber mat and exposed her skin for too long a period." On January 2 or 3, 1941, the plaintiff told the defendant that the burns were all unnecessary. He replied "that it

was because of negligence while they were upstairs"; that he could not understand how it happened; and that he washed and cleaned her off himself. From the burns there developed keloids, "a tumor-like condition which generally originates in a scar."

The defendant testified: "She got these burns while in the delivery room. . . . He thought she got the burns at the time of the delivery." In answer to interrogatories the defendant stated that "the plaintiff did receive burns on both her buttocks while she was under his care and treatment"; and that there were "no negligent acts or omissions on the part of the plaintiff or by others than the defendant which caused the injuries suffered by the plaintiff."

There was error in the direction of the verdicts. The plaintiff was not required to show the exact cause of her injuries or to exclude all possibility that they resulted without fault on the part of the defendant. It was enough if she showed that the harm which befell her was more likely due to negligence of the defendant than to some other cause for which he was not liable. *Rocha* v. *Alber*, 302 Mass. 155, 157–158. *Ruffin* v. *Coca Cola Bottling Co.* 311 Mass. 514, 516. *McCabe* v. *Boston Consolidated Gas Co.* 314 Mass. 493, 496. *Gilmore* v. *Kilbourn*, 317 Mass. 358, 363. See *Morris* v. *Weene*, 258 Mass. 178, 180. This is not a case where an inference of lack of proper care by the defendant rests upon the mere fact that the plaintiff suffered burns. See *King* v. *Belmore*, 248 Mass. 108, 114; *Semerjian* v. *Stetson*, 284 Mass. 510, 514. Nor is it a case lacking in proof of causal connection between the lack of such care and the ensuing injuries, as in *Wright* v. *Clement*, 287 Mass. 175. The jury could have found, in accordance with the defendant's admissions, that the plaintiff's injuries were due to negligence; that there was no negligence on the part of the plaintiff or of anyone other than the defendant; that, by the process of elimination, this negligence was that of the defendant; and that, in particular, this negligence of the defendant related to the exposure of the plaintiff in the delivery room, while under his direction and

care, to a solution on the delivery table which he himself had administered. *Barnett* v. *Roberts,* 243 Mass. 233. *Tully* v. *Mandell,* 269 Mass. 307. *Mahoney* v. *Harley Private Hospital, Inc.* 279 Mass. 96. *Zimmerman* v. *Litvich,* 297 Mass. 91. See *Leary* v. *Keith,* 256 Mass. 157. It is no answer to say that the statements that the negligence occurred "upstairs" did not show that it took place in the delivery room. Some of the admissions were specifically related to the delivery room and to the time of delivery. The jury could find that when or while "they were upstairs" meant when or while the plaintiff and the defendant were upstairs. Furthermore, we think that it sufficiently appears that the references to "upstairs" could be found to concern what occurred in the delivery room. The plaintiff testified that she was "taken up to the delivery room in the elevator." The plaintiff's husband testified that the delivery room was upstairs, and that after the delivery "she was taken downstairs below where the delivery took place." It does not appear that the defendant saw the plaintiff upstairs anywhere but in the delivery room. It is likewise no answer to say that the admissions were merely statements of regret, sympathy, and benevolence evoked by human suffering. This is, of course, true of the statements that it was a "shame" and "unfortunate." *Conti* v. *Brockton Ice & Coal Co.* 295 Mass. 15, 17. *Dunbar* v. *Ferrera Bros. Inc.* 306 Mass. 90, 93. *Rasimas* v. *Swan, ante,* 60, 62. But it is in no way true of the references to "negligence" and to the definite declaration that the burns were attributable to the solution being on the "mat" and to the plaintiff's skin being exposed to the solution "for too long a period." The defendant contends that "the mere use of the word 'negligence' does not supply the essential elements to justify a necessary finding of liability on his part." Without intimating in the least that this contention is sound (see *McGenness* v. *Adriatic Mills,* 116 Mass. 177, 178, 180–181; *Linnehan* v. *Sampson,* 126 Mass. 506, 510; *Zandan* v. *Radner,* 242 Mass. 503, 504, 505; *Salminen* v. *Ross,* 185 Fed. 997, affirmed sub nomine *Ross* v. *Salminen,* 191 Fed. 504 [C. C. A. 1]), it is enough to say that in the case at bar

much more is contained in the admissions than the mere use of that word. We appreciate that there was testimony from the defendant or from an expert called by him to the effect that the burns were due to friction and pressure or to a combination of shock and pressure, to the fact of labor debilitating the burned area perhaps more than some other areas on the body, and to the possible but rather unlikely augmenting of the foregoing by the touching of the burned area with Scott's solution; that in December, 1940, the use of Scott's solution was the accepted obstetrical practice in Boston; and that the plaintiff's injuries were unavoidable. Such testimony, with the weight and credibility of which we are not concerned, went no farther than to present an issue for the tribunal of fact.

*Exceptions sustained.*